ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
11This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Joseph H. Simpson, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
Respondent is the subject of two separate sets of formal charges, consisting of a total of three counts, which were consolidated for hearing before the hearing committee. All of the charges arise out of the same operative facts, and many of these facts have been stipulated to by respondent and the ODC.
By way of background, Mrs. Betty Kin-chen Bankston died in Tangipahoa Parish in May 2000. Mrs. Bankston was a widow with no children of her own, but she was survived by numerous nieces and nephews who were the children of her eight siblings, all of whom predeceased her. Mrs. Bankston’s estate consisted of approximately $200,000 in cash as well as several hundred acres of timbered real estate initially valued at between $1.6 million and $2.6 million.[1]
On July 3, 2000, Amite attorney Keith Rowe filed a petition to probate a statutory will which Mrs. Bankston had purportedly executed in November 1996. Succession of Betty Kinchen Bankston, No. 2000-030211 on the docket of the 21st Judicial District Court for the Parish of Tangipahoa. Mr. Rowe represented El-ston Sidney (E.S.) Bankston, who was one of Mrs. Bankston’s nephews and the sole residual legatee under the will. On the same day, the trial court ordered the will probated and appointed E.S. Bankston as executor of the succession.
During this time, some of the family members began to suspect that Mrs. Bankston’s signature on the probated will was a forgery or, alternatively, that she signed with the aid of others. There was also some question whether Mrs. Bank-ston was of sound mind when the testament was signed. On July 5, 2000, four heirs approached respondent to inquire about retaining his services to attack the probate of the will. After discussion, respondent informed the heirs that he would accept the representation only on a contingency fee basis and only if a handwriting expert could confirm that the will was a forgery. On the same day, respondent wrote to Robert Foley, a forensic document examiner, and asked him to review Mrs. Bankston’s will. On July 24, 2000, Mr. Foley sent respondent a written report in which he concluded that the signature on the will exhibited differences not observed in the other documents sent to him for comparison. Mr. Foley noted that these differences “may or may not be due to deterioration of health,” and he requested additional, more contemporaneous examples of Mrs. Bankston’s signature for review so that he could confirm his findings. On July 26, 2000, respondent tele *838 phoned Mr. Rowe and informed him that the will was a forgery. On July 28, 2000, respondent signed a one-third contingency fee agreement with twenty of Mrs. Bank-ston’s heirs.[2]
|aOn August 2, 2000, respondent filed a two-page document styled “Petition to Set Aside Will” on behalf of his twenty clients, alleging that Mrs. Bankston’s will was invalid. Five days later, on August 7, 2000, Mr. Rowe informed respondent that he was withdrawing the will from probate and that Mrs. Bankston’s estate would be distributed in accordance with the law of intestate successions, as respondent’s clients had sought. Respondent, in turn, notified the handwriting expert that no further work would be required on his part because “[t]he defendant in this matter has ‘caved.’ ”
In the weeks following the unexpected capitulation by Mr. Rowe’s client, respondent’s clients made contact with other family members who were asked to join in the “contest” of Mrs. Bankston’s will. Ultimately, fourteen more heirs signed respondent’s contingency fee contract after the will contest was resolved on August 7, 2000. Respondent did not inform these fourteen clients that the will contest had already been abandoned, nor did he advise them that they were otherwise entitled to receive their portion of the estate without paying any attorney’s fees.
In early September 2000, respondent received from Mr. Rowe a check in the amount of $123,145, representing the portion of the cash assets of the succession owed to respondent’s 34 clients. Respondent deposited Mr. Rowe’s check into his client trust account and immediately wrote himself a check for attorney’s fees in the amount of $41,044.12, despite having performed minimal work in the matter to that point.[3] Respondent did not obtain court approval for the fee disbursement, nor did he provide an accounting to his clients when he distributed the remainder of the funds to them in accordance with their respective interests in the succession.
|4On September 12, 2000, respondent filed an “Amended Judgment of Possession” which specifically recognized his fee interest in the case. The amended Judgment of Possession awarded respondent’s law firm “an undivided one-third (1/3) interest of the percentage interest of [respondent’s 34 clients] ... in and to all property comprising the assets of the estate of decedent, Betty Kinchen Bankston, including but not limited to the real estate, improvements and timber thereon, ...” Upon learning of respondent’s actions, Jeannette Rose Kinchen Perry, one of Mrs. Bankston’s nieces, filed a pleading seeking to annul the amended Judgment of Possession and challenging the amount of the attorney’s fee sought by respondent as unreasonably excessive.[4] In August 2001, *839 Ms. Perry filed a disciplinary complaint against respondent on the same grounds.The trial court subsequently granted summary judgment in favor of respondent dismissing the excessive fee claim. This judgment was reversed by the First Circuit Court of Appeal and the matter was remanded for trial on the issue of the reasonableness of the attorney’s fee sought by respondent. Succession of Bankston, 02-0548 (La.App. 1st Cir.2/14/03), 844 So.2d 61, unit denied, 03-0710 (La.5/9/03), 843 So.2d 400. Following remand, respondent and Ms. Perry reached a confidential settlement, and thus no trial was ever conducted.
On July 31, 2002, while the Bankston succession was still pending, respondent filed a petition for damages against Ms. Perry, alleging that various statements she made in the pleadings filed in the succession proceeding constituted defamation per se and false light invasion of privacy. Joseph H. Simpson v. Jeannette Rose Kinchen Perry, No. 2002-002580 on the docket of the 21st Judicial District Court for the Parish of Tangipahoa. On September 10, 2002, the trial court confirmed a $50,000 default | ¡judgment against Ms. Perry and in favor of respondent. Thereafter, Ms. Perry filed a motion for new trial, asserting that she had not been served with the petition for damages prior to the entry of the judgment against her. The trial court denied the motion, finding credible the testimony of a St. Tammany Parish sheriffs deputy who asserted that he had personally served the petition upon Ms. Perry at her home. On February 21, 2003, Ms. Perry filed a petition for nullity, on the ground that the same sheriffs deputy had been dismissed from the sheriffs office and arrested on multiple counts of malfeasance in office and injuring public records for “falsely claiming to have served at least two dozen court documents and trying to hide hundreds more in the woods,” Respondent opposed Ms. Perry’s petition, and the trial court refused to set aside the default judgment.
Ms. Perry suspensively appealed the trial court’s ruling. In résponse, respondent brought a motion to traverse the appeal bond as insufficient. The trial court granted the motion and rejected Ms. Perry’s bond. The court of appeal subsequently vacated the $50,000 default judgment and dismissed respondent’s suit. Simpson v. Perry, 03-0116 (La.App. 1st Cir.7/14/04), 887 So.2d 14.
DISCIPLINARY PROCEEDINGS
As previously noted, the ODC filed two separate sets of formal charges against respondent which were ultimately consolidated for hearing purposes. The ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.4 (failure to communicate with a client), 1.5 (fee arrangements), 1.8 (conflict of interest), 1.15 (safekeeping property of clients or third persons), 4.4 (respect for rights of third persons), 7.2(a) (direct contact with prospective clients), and 8.4(c) (engaging in conduct involving dishonesty, fraud, | fjdeceit, or misrepresentation). The ODC further alleged that respondent violated the immunity provisions of Supreme Court Rule XIX, § 12(A) when he filed suit against the complainant, Jeannette Perry. Respondent answered the formal charges and denied any misconduct. In particular, respondent asserted that his attorney’s fees were not excessive and were fully earned under the contingent fee contracts signed by the various heirs.

*840
Hearing Committee Recommendation

Following the hearing on the merits of the formal charges, the hearing committee submitted its report to the disciplinary board. The committee adopted the stipulated facts and made additional factual findings based upon the evidence in the record. The committee noted that respondent did little meaningful legal work in the short time that the succession proceeding was contested, but nevertheless he sought to “became the owner of a one-third interest in a 2 million dollar estate.” With regard to the litigation involving Ms. Perry, the committee found that her lawsuit contesting respondent’s fee interest in the succession “did not call for the response visited upon her by Respondent.” The committee noted that the allegations of Ms. Perry’s petition were not libelous, and commented that “there is absolutely no way a reasonable mind could believe” otherwise. Ms. Perry had to appeal the defective default judgment entered against her before the issues between the parties were eventually compromised.
Considering the ABA’s Standards for Imposing Lauryer Sanctions, the committee found that the baseline sanction for respondent’s misconduct is disbarment. The committee cited ABA Standard 4.31(a), which provides that disbarment is generally appropriate when a lawyer, without the informed consent of |7his client, engages in the representation of the client knowing that the lawyer’s interests are adverse to the client’s with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client. The committee also cited ABA Standard 4.62, which provides that suspension is generally appropriate when a lawyer knowingly deceives a client and causes injury or potential injury to the client.
The committee observed that this court has in the past suspended lawyers for misconduct similar to respondent’s. In In re: Comish, 04-1453 (La.12/13/04), 889 So.2d 236, the lawyer failed to adequately supervise his paralegal, allowing him to meet with clients, handle legal fees, correspond with attorneys and insurance adjusters, render legal opinions, and negotiate settlements. Cornish also failed to act with competence and diligence in preparing a will, neglected his client’s legal matter, and failed to adequately communicate with his client. For this misconduct, Cornish was suspended from the practice of law for a period of three years; however, in consideration of the significant mitigating factors, the court deferred all but one year and one day of the suspension. In In re: Boydell, 00-0086 (La.5/26/00), 760 So.2d 326, the lawyer was suspended for three years for charging an excessive legal fee and then engaging his client in nearly ten years of lengthy and protracted litigation over the fee. Finally, in Louisiana State Bar Ass’n v. Alker, 530 So.2d 1138 (La.1988), the lawyer engaged in an extensive pattern of misconduct, including charging excessive legal fees, failing to account for his clients’ funds, and converting the funds to his own use. Because Alker was already disbarred, the court extended the minimum period within which he could apply for readmission for an additional five years from the finality of its judgment.
Is As aggravating factors, the committee found the following: dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and substantial experience in the practice of law (admitted 1961). In mitigation, the committee recognized the following: absence of a prior disciplinary record[5] and a cooperative attitude toward the disciplinary proceeding.
*841 Under these circumstances, the committee recommended that respondent be suspended from the practice of law for one year and one day. In addition, the committee recommended that respondent “should forego any contingency interest in the succession and should be paid strictly reflecting the amount of time he invested in this suit which, according to him, constituted thirty hours and he should also be reimbursed for any costs expended. A condition should be imposed upon the Respondent to pay restitution to the heirs of any unearned fees.”
After the committee issued its report, respondent filed a motion seeking reconsideration and/or rehearing by the committee. Specifically, respondent sought reconsideration of the committee’s finding that he should forfeit the fees stemming from his representation of the first twenty heirs. The hearing committee chair denied respondent’s motion. Respondent then filed an objection to the hearing committee’s report and recommendation, likewise raising the forfeiture issue. Respondent also asserted that he should be exonerated from any finding of misconduct, and that the committee’s recommendation of suspension should be rejected.
| ¿Disciplinary Board Recommendation
The disciplinary board generally accepted the hearing committee’s factual findings, with the exception of a statement by the committee that respondent “had evidence from his handwriting expert that the will was indeed a forgery....” The board noted that the handwriting expert merely suspected the will was a forgery, and he had requested further writing samples be provided to him before he could be certain.
After reviewing the evidence in the record, the board made the following determinations regarding rule violations:
Rule 1.4: Respondent never personally met or talked with the fourteen heirs who agreed to retain him after August 7, 2000, the date when he learned from Mr. Rowe that the succession would not be contested. Respondent failed to give these fourteen clients basic and essential information concerning the succession, particularly the fact that the will had been "withdrawn from probate and that there was no longer an active will contest. Violations of Rule 1.4(a) and Rule 1.4(b) are clearly present.
Rule 1.5: Respondent contends that he is owed a fee of approximately $130,000 under his contingency fee contract dated June 28, 2000.[6] The board determined that this fee is clearly unreasonable, given respondent’s admission that he worked only twenty to thirty hours on this matter. Moreover, respondent filed only one pleading in the succession matter, namely a two page, five-paragraph pleading entitled “Petition to Set Aside Will.” A violation of Rule 1.5(a) has been established by the ODC.
ImRule 1.8: As previously noted, respondent allowed the fourteen heirs to retain him as their attorney without informing them that Mr. Rowe’s client had withdrawn the will from probate. By doing so, respondent used information that he received during his representation of the other heirs to the disadvantage of these clients. The fourteen heirs would have received more in their initial settlement *842 checks had respondent not been retained and his attorney’s fee not been taken out of their initial inheritance amounts. Moreover, had Ms. Perry not filed a complaint, respondent may have never been required to return these fees to these fourteen heirs. A violation of Rule 1.8(b) has been established by the ODC.
Rule 1.15: Respondent received $123,145 in succession funds from Mr. Rowe, deducted his fee of $41,044.12 from that amount, and then distributed the balance to his 34 clients. The disbursement sheet provided to the clients showed only the total amount of cash available for distribution, the percentage of the amount to which the heir was entitled, and the statement that “your check represents your interest, minus my attorney fee of 1/3.” No specific information concerning the exact amount of the inheritance sum and the exact amount of the attorney’s fee was given to the client. Respondent has now admitted that he improperly withheld his attorney’s fee from the initial inheritance checks paid to the fourteen heirs. By doing so, respondent failed to promptly deliver to his clients the funds that the client was entitled to receive, thus violating Rule 1.15(b).
Rule 4.4 and Supreme Court Rule XIX, § 12(A): By opposing Ms. Perry’s lawsuit, which was filed in an attempt to forestall respondent’s efforts to collect an excessive fee, respondent engaged in conduct that has burdened her with unnecessary litigation. Respondent also filed a meritless defamation suit against Ms. Perry, obtained a $50,000 default judgment against her, and opposed her appeal through the lnFirst Circuit Court of Appeal. As a result, Ms. Perry incurred over $63,000 in legal fees. Given respondent’s concession that the fee should have been returned to Ms. Perry, the litigation he conducted following the filing of her Petition to Annul the Amended Judgment can be described as nothing short of vexatious and contrary to Rule 4.4 and Rule XIX, § 12(A).
Rule 7.2(a): Respondent has admitted that he provided contingency fee contracts to several of the clients who initially contacted him regarding Mrs. Bankston’s will. These clients “took those contracts out and had different ones sign them.” Respondent did not speak with those individuals and was not present when the contracts were signed, and in at least three cases, he had no prior personal or professional relationship with the family members who signed the contracts. Respondent sought to gain monetarily by “signing up” as many heirs as possible. Under these facts, a violation of Rule 7.2(a) has been established by the ODC.
Rule 8.4(c): Respondent failed to give the fourteen heirs basic and essential information concerning the succession; he was dishonest by not telling the clients that there was no longer a will contest. He tricked the clients into signing contingency contracts when no contingency existed. The net result was that a fraud was committed upon the unsuspecting clients. When one client later protested by suing, respondent used the court system to hammer the client into submission by making the pursuit of justice economically impossible. Because of his lack of candor with his clients, he also initially charged and collected a one-third legal fee as to each client’s inheritance. Such conduct is dishonest and deceitful. A violation of Rule 8.4(c) has been established by the ODC.
The board found respondent violated duties owed to his clients, the public, and the profession. His conduct was knowing and intentional, and caused significant |iainjury. First, he deprived the fourteen heirs of their proceeds, which he unjustly withheld in September 2000. He also failed to tell these individuals that Mr. *843 Rowe’s client had withdrawn the will, thus engaging them in needless litigation concerning the will. He also caused Ms. Perry to expend over $63,000 in legal fees to litigate her claim over his excessive fee and to defend against his merit-less defamation suit. These legal fees remain unpaid, and at the hearing Ms. Perry’s attorney expressed her doubt that the obligation will ever be satisfied. Finally, the legal profession has been harmed by respondent’s use of heirs to “sign up” other clients.
Turning to the issue of an appropriate sanction, the board determined that the baseline sanction for respondent’s misconduct is disbarment. ABA Standard 4.61 provides that disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client. Respondent knowingly failed to inform the fourteen heirs of the basic information that the will had been withdrawn by Mr. Rowe’s client and that there was no longer an active will contest. Because of his lack of candor with his clients, he initially charged and collected a one-third legal fee as to each client’s inheritance. Such conduct caused actual, serious injury to these clients. Respondent then attempted to have his fee interest recognized in the judgment of possession without authority to do so and without consent of the parties. This conduct amounts to fraud by an attorney using the legal system for his personal gain. Had Ms. Perry not filed a complaint against respondent, these fourteen heirs may have permanently lost the legal fee they paid to respondent.
ABA Standard 5.11 permits disbarment when a lawyer engages in intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer’s fitness to practice. By failing to give the fourteen | theirs truthful information concerning the will contest, respondent acted dishonestly and misrepresented the status of the case to these unsuspecting clients. When questioned, he used the court system in an attempt to intimidate and financially burden Ms. Perry into submission. Such conduct is completely reprehensible and seriously adversely reflects on respondent’s fitness to practice law.
Likewise, Standard 7.1 provides that disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system. By failing to be truthful with all of his clients, and by causing others to improperly solicit clients on his behalf, respondent violated duties he owes as a professional. Such conduct has the potential to cause serious injury not only to clients, but also to the legal system.
Finally, Standard 4.31 permits disbarment when a lawyer, without the informed consent of clients, engages in the representation of a client knowing that the lawyer’s interests are adverse to the client’s with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client. Respondent engaged in a conflict of interest when he did not inform the fourteen heirs that the will had been withdrawn from probate and when he allowed them to retain him as their attorney. By doing so, respondent used information that he received during his representation of the other heirs to the disadvantage of these clients; these fourteen heirs would initially have received more inheritance funds had respondent not been retained and had his attorney’s fee not been taken from their initial settle *844 ment cheeks. Again, potentially serious injury was present. Had Ms. Perry not filed her complaint, respondent may have never returned the fees paid by these fourteen heirs.
[ t4In mitigation, the board recognized that respondent has no prior disciplinary record[7] and that he demonstrated a cooperative attitude toward the disciplinary proceeding. The board found the record supports the following aggravating factors: dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and substantial experience in the practice of law.
Considering the prior cases involving misconduct similar to respondent’s, the board found that the one year and one day suspension recommended by the hearing committee is too lenient. As to the excessive fee issue, the board considered In re: Levingston, 00-0161 (La.2/25/00), 755 So.2d 874, a consent discipline matter in which this court imposed a three-year suspension upon a lawyer who charged a grossly excessive legal fee in a succession matter. As to the vindictive litigation brought against Ms. Perry by respondent, the board looked to the Boydell case cited by the committee. Finally, as to the solicitation issue, the board found that In re: Sledge, 03-1148 (La.10/21/03), 859 So.2d 671, is instructive. In Sledge, the attorney was disbarred for paying money to current and former clients for referring prospective clients to him, as well as for neglecting legal matters and failing to adequately supervise his non-lawyer staff. The board noted the instant matter is similar to Lev-ingston in that respondent contends he is owed a large fee, approximately $130,000, for twenty to thirty hours of legal work, which included the filing of only one pleading in the court record. The case is also akin to Boydell in that respondent engaged in harassing and malicious litigation against Ms. Perry, causing her to incur legal fees of over $63,000. Further, like the respondent in Sledge, respondent has engaged in the improper practice of solicitation of clients by using other persons in 11Bviolation of former rule 7.2(a). Unlike Mr. Sledge, however, there is no evidence in the record to suggest that respondent gave monetary or non-monetary compensation to these individuals for “signing up” the clients for him. Further, no allegations have been made that respondent neglected legal matters or failed to supervise his non-lawyer employees.
Considering all of the circumstances of this matter, the board found there is no reason to deviate from the baseline sanction of disbarment. Accordingly, the board recommended that respondent be disbarred. The board also recommended that respondent forego any contingency interest in the Bankston succession; that he be paid a reasonable attorney’s fee which strictly reflects the amount of time he invested in the succession matter, which the board found was thirty hours; that he be required to pay restitution to the heirs of any unearned fees; and that he be reimbursed for any costs he expended in the succession matter. Finally, the board recommended that respondent be assessed with all costs of these proceedings.
Both respondent and the ODC filed objections to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this *845 court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the | ^hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Based upon our review of the record, we conclude that respondent’s misconduct in this matter falls into two principal categories: (1) charging an excessive legal fee and (2) engaging in harassing litigation with his client.
As to the issue of the legal fee, the record reveals that respondent has entered into one-third contingency fee contracts with his 34 clients. Respondent collected $41,044.12 in fees in September 2000 when he distributed the cash funds of the succession to his clients.[8] Moreover, while respondent has agreed to forego any contingency fee from the second group of fourteen clients, he contends that he is still owed approximately $130,000 under his contingency fee contract with the first group of twenty clients. Considering respondent’s admission that he worked only twenty to thirty hours on the succession matter before it was resolved, we find these attorney’s fees are clearly excessive.
Turning to the issue of the harassing litigation, we agree with the hearing committee and the disciplinary board that respondent’s conduct in the litigation against his client, Jeannette Perry, was nothing short of abusive. Respondent opposed Ms. Perry’s lawsuit which she filed in an effort to foreclose his assertion of an improper ownership interest in her aunt’s succession, and he filed a meritless defamation suit against her. Respondent even opposed his client when it came to light that she was not served with the suit prior to the entry of the default judgment against her. As a result of this vexatious litigation, Ms. Perry incurred substantial Illegal fees and suffered needless worry and distress. Respondent’s actions caused actual and substantial harm to Ms. Perry, as well as to the legal system.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses' involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent violated duties owed to his clients, the public, and the profession. His conduct was knowing and intentional, and caused substantial harm. The applica *846 ble baseline sanction ranges from a lengthy suspension to disbarment.
In mitigation, we recognize that respondent has practiced law in Louisiana for more than forty-five years, with only one minor blemish on his disciplinary record during that time. He also enjoys a good reputation in the legal community in which he practices. Considering these facts, we will impose a three-year suspension from the practice of law, but defer all but one year and one day of the suspension, subject to the following conditions: (1) respondent must make restitution of all excessive fees to his clients; (2) respondent must relinquish all claims to the fees being held by the Tangipahoa Parish Clerk of Court; (3) respondent must make restitution to Jeannette Rose Kinchen Perry and her attorney for any fees incurred in defense of the vexatious litigation filed by respondent.
hsDECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Joseph H. Simpson, Louisiana Bar Roll number 8259, be and he hereby is suspended from the practice of law for three years. It is further ordered that all but one year and one day of the suspension shall be deferred, subject to the conditions set forth in this opinion. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. In December 2004, the real estate was sold at a sheriff's sale for $1.37 million. The funds were placed into the registry of the court and were to be divided after an audit and the payment of taxes, fees, and expenses.

. Respondent required that his clients advance all court costs and the expenses of the handwriting expert because "he did not believe that this was the kind of case in which he would be willing [to] invest his personal funds." See Joint Stipulation of Facts, ¶ 13. Moreover, respondent included a clause in the contingency fee agreement which provided that "[i]f the handwriting expert cannot testify that the will is a forgery, suit will be discontinued.”

. Respondent did not keep timesheets or other records reflecting the amount of time he actually spent working on this matter; however, he has estimated that prior to the resolution of the will contest on August 7, 2000, he worked on the matter for approximately twenty to thirty hours. See Joint Stipulation of Facts, ¶ 30. Notably, the hearing committee made a factual finding that “[t]here is very little evidence that Respondent did much more, if in fact he spent that much time.”

.Ms. Perry was not one of respondent's twenty original clients; rather, she was one of the group of fourteen clients who signed the con *839 tingency fee agreement after the will contest was resolved on August 7, 2000.

. This finding is in error. As respondent admits in his brief filed with this court, he was *841 previously admonished by the disciplinary board for “an illegal campaign contribution.”

. The board made a finding that respondent entered into a valid contingency fee agreement with the twenty clients who signed the agreement on June 28, 2000. The board reasoned that "the ‘risk’ of whether or not the will was valid was still in existence at the time the contract was signed by [the] first group of twenty heirs.... ”

. Again, this finding is in error. See note 5, supra.

. Respondent testified at the disciplinary hearing that he has agreed to abandon any claim for attorney's fees paid by the second group of fourteen clients; however, he admitted that he had not yet actually returned funds to any of those clients, with the exception of Ms. Perry, because "she had brought a lawsuit.”